Judgment rendered October 1, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,464-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

JESSE M. FREEMAN AND                    Plaintiffs-Appellants
KIMBERLY M. FREEMAN

versus

EMERSON CENTRE, INC.                    Defendants-Appellees
D/B/A SOARING SPIRITS
ZIPLINE AND RICHARD W.
EMERSON

* * * * *

Appealed from the
Third Judicial District Court for the
Parish of Lincoln, Louisiana
Trial Court No. 61,720

Honorable Thomas Wynn Rogers, Judge

* * * * *

LUNEAU & BECK, LLC                      Counsel for Appellants
By: W. Jay Luneau

HUDSON, POTTS & BERNSTEIN, LLP          Counsel for Appellees
By: Gordon L. James

* * * * *

Before COX, ROBINSON, and ELLENDER, JJ.

**COX, J.**

This appeal arises from the Third Judicial District Court, Lincoln Parish. Appellants appeal the district court's ruling denying their petition for damages. For the following reasons, we affirm the district court's ruling.

**FACTS**

This action arises out of injuries Jesse Freeman ("Jesse") sustained on July 3, 2020. Jesse and his wife, Kimberly (collectively, "Appellants"), filed a petition for damages on June 18, 2021, naming Emerson Centre Inc., d/b/a Soaring Spirits Zipline ("Soaring Spirits") and the sole owner and operator, Richard Emerson ("Emerson"), as defendants.

Appellants alleged that while riding on the advanced zipline course, Jesse struck a tree and injured his foot. Appellants asserted that the incident was caused by the fault and negligence of the defendants, independently and through the acts and/or omissions of their employees, which consisted of the following:

> A. Constructing a zipline course in a manner which it knew or should have known was defective and unreasonably dangerous;
>
> B. Failing to implement and/or have in effect the proper procedures, protocols[,] and guidelines to ensure that the zipline course could be safely utilized by its patrons;
>
> C. Failing to properly maintain the zipline course and to keep it free from unreasonably dangerous hazards;
>
> D. Failing to properly inspect the zipline course to make sure that it could be safely used by its patrons; and
>
> E. Failing to warn patrons as to the location of and how to avoid hazards on the zipline course about which it knew or should have known.

In answer to the petition, defendants denied any negligence or liability for the injuries Jesse sustained and instead posited that Jesse's own actions

caused his accident and resulting injuries. A bench trial was held on July 1, 2024, wherein the following testimony was presented:

First, Emerson testified that he started operations for Soaring Spirits in 2016, when he designed and constructed 19 zipline courses consisting of beginner, intermediate, and advanced courses. Emerson explained that he designed each course as he envisioned it and without developing a blueprint prior to construction. Emerson admitted that while he did not consult with any experts or engineers during construction, he did obtain information from various internet sources concerning ziplines and zipline construction, as well as a consultation with Zip Lining Gear, a company that sells ziplining gear and equipment.

Emerson explained that he constructed the ziplines to extend from tree to tree, that each cable was connected by clamps to secure the cable, and that platforms were located at the starting and ending point for each zipline. He further explained that in installing the zipline, he removed hundreds of trees, and the remaining trees were left to provide shade and add to the experience and aesthetic value of the course. Emerson stated that, from his research, he found that there needed to be a minimum of "six to eight feet" of clearance on either side of a zipline cable. Emerson admitted he measured the distance between the trees and the zipline by sight because he felt he was capable of making an accurate assessment of distance based on his years of playing golf and estimating distances by sight.

Emerson acknowledged that there were two trees on either side of the zipline course where Jesse injured his right foot after he struck a tree on one of the advanced courses. Emerson stated that while he did not consider the distance a patron could swing out during the descent, he emphasized that his

employees were trained to advise each guest to apply their brakes and/or stick their legs in front of them to prevent swinging or swaying, and in general, a patron who had difficulty stopping themselves from swaying or swinging would not have moved on to the advanced course.

In describing the zipline cable and platform where Jesse was injured, Emerson explained that while the platform encompassed two trees, the cable was only connected to one tree; as such, a patron would have to stand to the left to be centered under the cable to prevent swaying. Emerson stated that even if a patron was not lined up directly under the zipline cable when they took off from the platform, it would not cause them to swing because such an action would require more inertia; however, it could cause the patron to sway, which would be acceptable because it would not reach out past the six- or eight-foot limit. Emerson stated that to swing out that far, one would likely have to create the extra force by jumping, which he was informed Jesse had done.

Emerson admitted he did not register the business with the State Fire Marshal or have the ziplines inspected after construction was completed. He stated that while he researched the matter, he did not find any requirement to either have an inspection, register the course, obtain safety approval, or have general liability insurance prior to opening the business. Emerson testified that some of his employees were minors, but they were trained by him and other employees who had certifications in zipline safety and training.

On cross-examination, Emerson stated that a crucial aspect of zipline safety is braking. Counsel for defendants then read a statement from the "Complete Guide to Zipline Safety and Braking Systems," which provided in part, "[c]lear the zipline avenue of obstructions at least seven feet below

3

and five feet on both sides of the zipline." Emerson confirmed this information and testified that his ziplines were free of obstructions from six to eight feet on either side. Emerson stated that patrons sign a waiver and are instructed on how to use the zipline and brakes prior to starting the beginner's course, which they must pass before continuing to another course. Emerson stated that he and his guides stressed the importance of braking for safety purposes, and that he installed "stop blocks" if a patron failed to use their brakes so that they would not injure themselves. Emerson estimated that over 1,000 patrons used the ziplines, but Jesse was the only one who was ever injured while using this particular zipline.

Mackenzie Hedgepeth ("Hedgepeth"), a former employee, testified that she was hired as a zipline guide in 2019 at 13 years old. She explained that as a guide, she was responsible for taking patrons through each zipline course, securing patrons into harnesses, and providing safety and braking instructions for each zipline. Hedgepeth stated that she was one of the two guides for Jesse's group. She stated that because Jesse completed both the beginner and intermediate courses without issue, she determined he could proceed to the advanced course.

In describing the zipline where Jesse injured himself, Hedgepeth testified that a patron would have to be on the left-hand side of the platform before taking off to be centered under the cable. Hedgepeth explained that if a patron took off and was not centered, it could cause them to sway.[1] Hedgepeth stated that when she secured Jesse to the cable, she stood to his

_____

[1] Counsel for the Appellants then questioned, "[A]nd that's what happened to [Jesse], right, he was swinging from side to side before his accident?" Hedgepeth answered in the affirmative; however, this Court notes that Hedgepeth previously explained that Jesse was centered when he left the platform.

left where a rail was located, but stated Jesse was still centered under the cable. Hedgepeth testified she informed Jesse of the braking points on the course before he left the platform, the first of which was the tree he struck. Hedgepeth explained that when Jesse left the platform, he swayed drastically, and she yelled for him to "pull down, pull down" on his brake.

Hedgepeth testified that she witnessed Jesse hit the tree to the left of the zipline, which she estimated to be a little under 10 feet away from the cable. Hedgepeth acknowledged that in her deposition, she estimated that the tree was approximately four to five feet away from the zipline cable but stated that she initially underestimated the distance. However, Hedgepeth later stated that if a patron's legs were stuck out straight, the tree would be approximately four to five feet away during the descent. Hedgepeth stated that while Jesse never said he was going to swing out, he made it sound as if he was going to do something.

On cross-examination, Hedgepeth reiterated that when Jesse left the platform, he swung drastically, as far as the length of the lanyard that connected the patron to the cable, until he struck the tree. Hedgepeth stated that on a prior course, Jesse bounced on the line, which caused her to inform the patrons again that when they left the platform they should use their brakes because the advanced course was faster. She stated that she explicitly instructed him to use his brakes on the advanced course; however, she noticed that Jesse never slowed down, as if he had not used the brakes.

Next, Desarae Fraizer ("Fraizer"),[2] another former employee, testified she was with Hedgepeth the day Jesse was injured and that she worked as

---

[2] Abigail Frazier, another employee, also testified that she couldn't recall what instructions were given to Jesse and did not remember if anyone told him to brake before

5

the catcher for Jesse's group. She explained that a catcher receives the patron after they descend the zipline, unhooks them, clears them out of the path of the next zipliner, and serves as an example to the patron of how to properly descend. Fraizer stated that as catcher, she was the first person to descend and was already at the bottom platform before Jesse took off, so she did not see where Jesse was positioned when he left the platform. Fraizer testified that for the advanced zipline, it was required that patrons brake at the beginning and then brake at the later brake points as well. Frazier stated she saw Jesse hit the tree on his left, and that someone yelled for him to brake.

Next, Jesse testified that when he and his family arrived at the zipline course, they were given safety instructions and warnings against engaging in horseplay. Jesse stated that the instructors emphasized that they should descend in a straight manner and gave instructions on how to use the brakes. However, Jesse could not recall anyone instructing him to brake should he sway or swing while on the zipline. Jesse then recalled that he was informed that he should stick his legs out and brake to stop rotating, which he experienced on other courses. Concerning the zipline where he was injured, Jesse stated that one of the guides informed him that this was a faster course, and that he would need to apply the brake just before he reached the tree he ultimately collided with.

Jesse explained that when he left the platform, the cable was over his left shoulder, and he was instructed to sit and let the line guide him. Jesse

---

he struck the tree. She recalled that when Jesse left the platform he "kinda went off like swung off to the left a little bit," which caused him to swing the entire way down. She also stated that it did not appear he ever slowed down.

6

denied that he was instructed to brake immediately and stated that as soon as he left the platform, his body "corrected hard to the left," which caused him to involuntarily swing in that direction. Jesse explained that he swung three times, first to the left, then right, and on the third swing, he went back to the left and his right heel struck a tree located on the left side of the cable. He stated that the impact caused him to lose momentum and spin until he was assisted down. On cross-examination, Jesse stated he had been on a zipline prior to this experience, and that he thought some swinging on the ziplines added to the enjoyment of the ride.

Kimberly also testified that during the zipline course, the instructors emphasized using the brakes. Kimberly testified that they were instructed to keep their feet in front of them if they started to turn or swing. For the advanced zipline, Kimberly stated that the guides' instructions focused more on braking, but no additional instructions were given concerning turning or swinging. Kimberly testified that she saw Jesse swinging but was not concerned until Jesse struck the tree, which caused him to spin and slow down.

Finally, Phillip Beard ("Beard"), an expert in structural engineering, testified that this was his first time providing an opinion on ziplines and he had not done research on ziplines prior to this case. He stated that he read the Louisiana State Fire Marshal regulations but did not find any specifications for ziplines. Beard stated he performed an onsite inspection of the zipline course but admitted that the course had been shut down since December 2020, and that the launching platforms and ziplines had been damaged due to weather. Beard admitted that because of these conditions, it was difficult to determine the location where the zipline in question

7

extended between the trees because there was little left save for holes in the trees where the platforms had once been attached. Beard stated that he used Jesse's height and estimated how far the zipline cable could swing from side to side. Beard testified that the only way Jesse could have struck the tree was if the zipline cable was less than seven feet from the tree. Beard opined that, from a safety perspective, there was no structural reason for the tree to have been in close proximity to the zipline cable, and it would have been better if the tree had been removed.

On cross-examination, Beard admitted that he did not measure the distance between the two trees where the zipline in question was located or estimate where the zipline was located in relation to either tree. Beard also acknowledged that at least two internet publications indicated that, in regard to zipline safety, obstructions should have a clearance of at least seven feet below the zipline avenue, and at least five feet of clearance on either side of the zipline cable. He further agreed that Emerson's clearance of at least six to eight feet on either side of the zipline cable was correct. On re-cross examination, Beard described the tree Jesse struck as an actual hazard and stated that Emerson should have considered removing the tree if it was a potential hazard.

At the close of testimony, the district court requested post-trial briefs, and the matter was submitted for consideration and taken under advisement. On October 31, 2024, the district court issued its ruling and written reasons, wherein it dismissed Soaring Spirits as a defendant for lack of evidence establishing ownership of the zipline course, and ruled in favor of Emerson, dismissing the Appellants' claims. This appeal followed.

8

## APPLICABLE LAW

As a matter of law, the owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.  La. C.C. art. 2317.1.

To recover damages caused by a defective thing, the plaintiff must be able to prove that (1) the thing was in the defendant's custody, (2) the thing contained a defect which presented an unreasonable risk of harm to others, (3) the defective thing caused the damage, and finally that (4) the defendant knew or should have known of the defect.  *Wheat v. State Farm Fire & Cas. Co.*, 55,712, (La. App. 2 Cir. 7/17/24), 399 So. 3d 509, *writ denied*, 24-01012 (LA. 11/14/24), 395 So. 3d 1186, citing *Perkins v. Air U Shreveport LLC*, 52,093 (La. App. 2 Cir. 5/23/18), 249 So. 3d 187, and citations therein. The mere fact that an accident occurred because of some vice or defect does not elevate the condition of the thing to that of an unreasonably dangerous defect.  *Id*.

A "defect" in a thing, for which one having custody of the thing may be liable for the damages caused, is a condition or imperfection that poses an unreasonable risk of injury to persons exercising ordinary care and prudence. *Id*.  To determine whether liability exists under art. 2317.1, courts use a duty-risk analysis, under which a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element), (2) the defendant's conduct failed to conform to the appropriate standard (the breach element), (3) the defendant's substandard

conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element), (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of duty element), and (5) proof of actual damages (the damages element). *Id.*; *Farrell v. Circle K Stores, Inc.*, 22-00849 (La. 3/17/23), 359 So. 3d 467. Failure to prove any one of these elements by a preponderance of the evidence is fatal to the plaintiff's claim. *Id.*

Whether there was a breach of the duty owed is a question of fact or a mixed question of law and fact. *Id.* Louisiana courts apply the risk/utility balancing test to make this determination, wherein the Supreme Court synthesized the risk/utility balancing test to a consideration of four pertinent factors: (1) the utility of the complained-of condition; (2) the likelihood and magnitude of harm, including the obviousness and apparentness of the condition; (3) the cost of preventing the harm; and (4) the nature of the plaintiff's activities in terms of social utility or whether the activities were dangerous by nature. *Id.*

The trier of fact determines whether a defect presents an unreasonable risk of harm and that determination is reviewed under the manifest error standard. *Guerrero v. Brookshire Grocery Co.*, 49,707 (La. App. 2 Cir. 4/29/15), 165 So. 3d 1092. The trier of fact is owed great deference in its allocation of fault and may not be reversed unless clearly wrong or manifestly erroneous. *Id.*

**DISCUSSION**

Appellants have raised three assignments of error on appeal.

*Assignment of Error 1: Defect in the zipline course*

By their first assignment of error, Appellants argue the district court erred in finding that they did not satisfy their burden of proof in showing that the zipline contained a defect, i.e., that the location of the tree created an unreasonable risk of harm.

Specifically, Appellants argue that, regarding the utility of the object, the tree Jesse struck "served no utility purpose for the zipline" because "no zipline had to be connected to the tree for [the zipline] to function properly." Appellants highlight that Beard specifically testified about the importance of having a clear field on either side of a zipline, and Emerson testified that one of the reasons he did not remove the tree was for aesthetics, rather than out of necessity for the zipline to function.

With respect to the second factor, the likelihood and magnitude of the harm, Appellants argue Emerson should have known that if a tree were left too close to the zipline, a rider could potentially strike the tree, resulting in injuries. Appellants assert that Emerson, in measuring the distance of the tree to the zipline by sight alone, failed to accurately determine whether a patron could swing out and strike the tree as done in this case. Appellants note again that Beard referred to the tree Jesse struck as a "real hazard" and that potential hazards, such as swinging or swaying into a tree, were a safety factor Emerson was aware of and should have investigated.

Appellants further argue that the cost of removing the tree was relatively low in comparison to the damages Jesse sustained. Finally, in discussing the nature of the activities, Appellants argue Jesse used the

11

zipline for its intended purpose, and no evidence was presented to show Jesse's own actions caused the accident.

In addressing the first factor, this Court agrees with the Appellants that the utility of this particular tree, insofar as structure and maintenance of the course is concerned, is relatively minimal. Specifically, we note that Emerson testified that in constructing the ziplines, he removed hundreds of trees, and any remaining trees not connected to a cable or platform provided shade or added to the experience and aesthetics of the course. Given this, it is arguable that the utility of this single tree which purpose is primarily limited to shade and aesthetics, is low considering it is located among several other trees which equally contribute to the same intended purpose. Therefore, we cannot say that the utility of this tree outweighs its potential harm to others. However, the inquiry balancing the risk/utility test does not end at this factor alone.

The remaining factors (likelihood and magnitude of the harm, cost of preventing the harm, and the nature of the plaintiff's activities) will be summarily addressed. Appellants assert that the location of the tree Jesse struck, in relation to the zipline cable, presented an unreasonable risk of harm to patrons who could potentially swing out, if not properly lined up under the cable at the launching platform, and strike the tree. However, as the district court noted in its written reasons, there was insufficient evidence presented at trial to support the Appellants' assertion.

Specifically, we find that the record, including the testimony from the Appellants' own expert witness, reflects that the distance from the tree to the zipline could not be accurately determined to make a definitive finding that the tree's proximity to the zipline presented an unreasonable risk of harm.

12

Beard stated that the State Fire Marshal does not have regulations regarding zipline standards, and Emerson did not seek approval or have an inspection from the State Fire Marshal to determine if any obstructions were too close to the zipline cable. Instead, the only benchmark presented to the district court to determine whether the location of the tree to the zipline cable was defective was Emerson's testimony that there should be at least a six-to-eight-foot clearance on either side of the zipline. While Beard testified that his own research revealed that there should be at least a seven-foot clearance on either side of a zipline cable, he nevertheless admitted that at least two articles on ziplines that he relied on to produce his report for this matter did not require a seven-foot clearance, but five feet instead.

Although Emerson testified that he measured the distances between trees to cables to ensure there was a six-to-eight-foot clearance, he did so by sight alone. While Beard stated Jesse would not have struck the tree unless it had been at least seven feet away from the zipline, we note that Beard did not and could not obtain an accurate distance between the tree and the cable. While Beard conducted an on-site inspection of the course, we note that the course had been closed since December 2020, and according to Beard's own testimony, a windstorm "heavily damaged" the course such that some platforms were torn down, and the zipline where Jesse was injured was no longer present.

Accordingly, Beard was unable to measure the distance from the tree to the zipline cable and admitted he did not know where the zipline had been located to make this determination. Instead, Beard stated he estimated the distance by using Jesse's height, and an estimation of how far the lanyard,

which hooked Jesse's harness to the cable, could potentially swing out. Specifically, Beard stated:

> Well[,] I tried to get a standard that I could work from and I did that by reasoning out by just basically just sitting down as if I were in a harness hooked up and ready to go onto the zipline traverse. And—and what I did is I lifted my feet out away from my body and then measured the distance from my backbone to the end of my feet and it was thirty-six inches. Now Mr. Freeman's a little shorter than I am so his probably would be less than thirty-six inches. And so[,] with the center of mass being close to your tailbone, it varies depending on your weight, then your—your body's gonna react according to the center of mass.
>
> And so as he described as he was going down he—he—his feet began to turn to the left and then he probably was swinging as it's been established that there was swinging to some degree. But I—I present this—this is the thing right here. If in fact he was swinging, say, two feet which would be a pretty good swing for a—for that mechanism, it would swing out maybe that far and come back again and maybe swing the other direction or like someone used the term "pendulum" but that would be close to it. But if it went two feet plus thirty—six, that's five feet. If he'd of been in the seven-foot limit, then the accident wouldn't have happened.

As noted by the district court, Beard's methodology was based on an estimation. Without more accurate calculations, or specifications as to the location of the zipline, or even information as to how long the lanyard that was attached to the zipline cable was, we agree with the district court that the evidence presented was too speculative to say that Appellants satisfied their burden of proof to show that the location of the tree was defective.

Moreover, the district court was in the best position to hear and assess the credibility of all witnesses and testimony presented, and the district court in this case specifically found that because Beard "made no attempt to actually measure the distance from the tree to a point where one could estimate where the line was located," it questioned his method of analysis

14

and found him unconvincing. We, therefore, find that this assignment of error lacks merit.

***Assignment of Error 2: Knowledge of the defect***

By their second assignment of error on appeal, Appellants argue that the district court erred in determining that the Appellees did not have actual or constructive knowledge of the defect or condition of the zipline.

Appellants argue that constructive knowledge can be found if the conditions that caused the injury existed for such a period of time that those responsible, by the exercise of ordinary care and diligence, must have known of their existence in general and could have guarded the public from injury. Appellants assert that because the advanced course was completed in 2018, Emerson, who personally constructed several of the courses, had two years to correct the defect and should have known there was a possibility that a rider could strike a tree if they did not leave the platform properly.

The concept of constructive knowledge imposes a reasonable duty to discover apparent defects in things under the defendant's garde. *Ladner v. Trinity Group Ltd.*, 45,937 (La. App. 2 Cir. 2/16/11), 57 So. 3d 1197, *writ denied*, 11-0580 (La. 4/29/11), 62 So. 3d 115. As the district court noted, there was insufficient evidence to show Emerson knew there was a defect in the location of this tree to this zipline cable. Appellants assert in brief that if Emerson complied with safety regulations or registered his course with the State Fire Marshal, then the defect would have been discovered.

However, we note that Appellants produced no safety standards or regulations to show that regular inspections should have been conducted or how often. In fact, Beard, the Appellants' expert, acknowledged there was no requirement for zipline owners to register with the State Fire Marshal.

15

Likewise, there was no evidence Emerson violated any safety code or regulation. Even assuming arguendo that the lack of inspection constituted a lack of reasonable care to discover the defect, we cannot say, based on the record before us, that the alleged defect was apparent such that Emerson would have discovered it.

Here, Emerson stated that since he opened the zipline course, he had thousands of patrons attend the course, and there had been no accidents on this particular line either prior to Jesse's injury or in the four to five months *after* the incident occurred but before the course closed. While Appellants assert Emerson knew that a patron would have to stand on the left side of the platform before leaving to prevent swaying or swinging, Hedgepeth testified that even though she stood to Jesse's left, he was still lined under the cable when he left the platform.

With no evidence of prior incidents, complaints, or violations of safety regulations, the Appellants could not show that Emerson knew or should have known of the alleged defect.

### Assignment of Error 3: Res Ipsa Loquitor

By their final assignment of error, Appellants argue that the trial court erred in finding that they did not meet the criteria to satisfy *res ipsa loquitur*.

In *Linnear v. CenterPoint Energy Entex/Reliant Energy*, 06-3030 (La.9/5/07), 966 So. 2d 36, the Louisiana Supreme Court explained the proper application of the doctrine of *res ipsa loquitur*:

> The doctrine of *res ipsa loquitur* applies in cases where the plaintiff uses circumstantial evidence alone to prove negligence by the defendant[.] The doctrine, meaning "the thing speaks for itself," permits the inference of negligence on the part of the defendant from the circumstances surrounding the injury[.] [T]he doctrine applies when three criteria are met. First, the injury is the kind which ordinarily does not occur in the absence

16

of negligence. While the plaintiff does not have to eliminate all other possible causes, he must present evidence indicating at least a probability that the accident would not have occurred absent negligence. Second, the evidence must sufficiently eliminate other more probable causes of the injury, such as the conduct of the plaintiff or a third person. The circumstances must warrant an inference of negligence. Third, the negligence of the defendant must fall within the scope of his duty to plaintiff. This may, but not necessarily, be proved in instances where the defendant had exclusive control of the thing that caused the injury.

The trial judge determines whether reasonable minds could differ on the presence of all three criteria. If reasonable minds could not conclude that all three criteria are satisfied, then the legal requirements for the use of *res ipsa loquitur* are not met. *Perkins*, *supra*.

In this case, the district court considered that Jesse's injury could not have happened in the absence of a defect in the zipline. However, given the totality of the evidence and testimony presented, the district court rightfully considered the equally probable cause that Jesse's own actions caused his injuries. We agree. Emerson testified that he and the other instructors stressed the importance of braking, especially if one should sway during the zipline ride. Jesse's wife, Kimberly, also admitted that their group was told to use their brakes and keep their feet in front of them if they started to turn or sway. Jesse, who was fully aware of these instructions and safety guards, completed several beginner and intermediate courses and at least two other advanced ziplines without incident.

However, testimony reflected that when Jesse left the platform, he did not appear to have employed his brakes at any point. Jesse testified that he swung violently from left to right when he left the platform because one of his guides stood to his left, where he should have been. However, his guide, Hedgepeth, testified that while she stood to Jesse's left, there was plenty of

17

room on the platform for both of them, and Jesse was still lined underneath the cable.  Moreover, despite the instructions to brake in the event of turning or swaying, Hedgepeth stated that it appeared that Jesse never slowed, as if he had not employed his brakes.  Appellants never asserted that Jesse used his brakes but they were defective or failed to stop his swinging.

Given the testimony presented, we agree with the district court's analysis concerning this matter.  Therefore, we find the doctrine of *res ipsa loquitur* is not applicable in this matter.

## CONCLUSION

For the reasons stated herein, we affirm the district court's ruling denying the Appellants' petition for damages.  Costs of this appeal are assessed to the Appellants.

**AFFIRMED.**